IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

———————————————

| | |
|---|---|
| LAWRENCE F. ROEDEL, | Cause No. CV 10-71-M-DWM-JCL |
| Petitioner, | |
| vs. | FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE |
| WARDEN LAW; ATTORNEY GENERAL OF THE STATE OF MONTANA, | |
| Respondents. | |

———————————————

On June 22, 2010, Petitioner Lawrence Roedel filed this action for writ of habeas corpus under 28 U.S.C. § 2254. Roedel is a state prisoner proceeding pro se. He challenges his conviction for deliberate homicide, entered following a jury trial in Montana's Eleventh Judicial District Court, Flathead County.

On June 29, 2010, Respondents were ordered to file the trial transcript, Roedel's state petition for postconviction relief and any amended petitions, trial and appellate counsels' affidavits filed in state court, and the trial court's decision denying postconviction relief. They filed the required documents on July 19 and July 21, 2010.

1

## I. Background

To understand the nature of Roedel's claims, it is important to set out the evidence presented at trial in some detail.

On August 27, 2005, Roedel shot his wife, Dawn Thompson, in an enclosed stairwell leading from the garage of their home to Roedel's bedroom over the garage. The bullet entered the back of Thompson's right shoulder, struck two ribs, the right lung, two vertebrae, and the left lung, exiting the left side of her left flank.  Trial Tr. (doc. 13) at 377:22-378:18.  Her body came to rest on the lowest three or four stairs. She was on her back with her knees on the floor.  Id. at 181:14-21.  There was blood on the stairs underneath her, id. at 181:19-20, and a shard of glass was found on the bottom step under her body, id. at 264:11-266:12, with blood underneath it, id. at 749:1-16.  Next to her, atop a woodpile, lay a broken wine glass with a small amount of liquid in it that looked and smelled like wine.  Id. at 182:24-183:11, 261:4-262:12. The shard came from the wine glass.  Id. at 266:3-8.  Thompson's left thumb and index finger left prints on the glass.  Id. at 429:5-8.  Roedel and Thompson's fifteen-year-old daughter, E., recognized various objects as having been on the woodpile for some time, but she had not seen a wine glass there before.  Id. at 207:25-208:23, 223:1-224:18.

After the shooting, Roedel woke E. and told her that Thompson "was coming

2

up the stairs with a gun." Id. at 212:24-213:1. He called 911, using words to the effect of, "Wife's mad at me, she comes up with a .357, she's pointing it at me, she's threatening my life with it. I got ahold of it, we wrestled with it, the thing went off. She turned her back on me, she was running, she had ahold of the gun, we went out the door, the thing went off." Trial Tr. at 707:7-12 (defense counsel's description of 911 call). Law enforcement arrived on the scene ten or fifteen minutes later. As Roedel took Sergeant Carlson[1] through the house into the garage, he said that he and Dawn "were arguing, and as she went down the stairs he shot her in the back." Id. at 186:8-10. Flathead County Detective Landis arrived on the scene an hour later. Roedel told her that "'we were fighting over the gun, it went off, and I shot her in the back.'" Id. at 252:23-25.

The only door on the scene that both Roedel and Thompson could have gone "out" was the door to Roedel's bedroom at the top of the stairs. No bullet hole was found inside the bedroom. In the wall of the stairwell, ranged down the stairway, were three bullet holes. Id. at 185:16-18. The two nearest the top of the stairs were smooth-edged and circular, angled downward, and went all the way through the wall to the outdoors. One bullet was found on top of a woodpile stacked against the wall

---

[1] Roedel's home is in Flathead County, near the border with Lake County. Sergeant Carlson of the Lake County Sheriff's Office arrived first on the scene. The investigation and prosecution was conducted by Flathead County.

outside the garage.  The other was not found.  Id. at 287:20-290:17, 566:20-568:8.

To put the two bullets on the trajectories they followed, the shooter had to move from

one side of the staircase to the other between shots.  Id. at 534:22-535:21, 549:16-

550:5.

The third bullet hole, nearest the bottom of the steps and just above

Thompson's body, was "drastically different" from the other two.  The bullet made

an oblong hole on the face of the wall, revealing the gypsum.  Because the hole was

ragged, the trajectory of the bullet could not be determined.  The bullet was found in

the wall.  It was misshapen, as if it had struck one or more hard objects.  Neither the

wall nor the insulation were tested for traces of blood or tissue.  The bullet was tested,

but no trace evidence was found.  Trial Tr. at 320:1-322:11, 361:5-14, 478:12-479:16,

481:15-482:23, 504:7-23.

There was no evidence of embedded gunpowder or embedded gunshot residue

("GSR") at the entry wound in Thompson's skin and only one particle of gunpowder

near the hole in her shirt.  An expert deduced that Thompson had to be more than five

feet away from the gun when it fired the bullet that killed her.  Id. at 399:20-400:18,

470:2-22, 502:3-23.

Roedel told Flathead County Detective Fulton that Thompson fired at him

twice, though he "did not have the feeling that it was shot down next to me, and I

4

think that it was to scare me more than any . . . thing." He then wrestled the gun away

from her.  "I remember poppin' that [the cylinder] somehow, spinnin' it, and lookin'

at it, poppin' it back in and the . . . thing had fired.  And that's all I can remember.

And, uh, did I shoot it more than once?  I don't even remember that."  Pet'r Ex. N at

21.[2]  In an interview on August 29, Detective Landis asked Roedel, "So do you think

that you could have fired those three shots in an attempt to get that on an empty

cylinder?"  He responded, "It may have been possible," but, he continued, "it doesn't

explain – I thought I was shot at twice down the hallway."  Trial Tr. at 350:2, 350:16-

20, 352:14-17.

> In an interview on September 19, Roedel said:
>
> I know I fired the first shot.  And I think the hammer was back.  There
> was something wrong with that son of a bitchin' gun from the get-go, I
> told them that from the get-go.  I think the hammer was back on it, and
> I think my hand was trembling.  I do think that first shot went off
> accident[al]ly, and I don't even remember the other two.  And from there
> I – I go in and am crouching by my desk.  And that's when I hear . . .
> that's when I heard her voice saying, "Larry."  And I turned the light on,
> and she's standing down there, "you just shot me."

---

    [2]  All documents labeled "Pet'r Ex." are contained in the voluminous materials
that were not scanned into the electronic record.
    Exhibit N is a transcript of Roedel's interview with Fulton.  In the interview,
Fulton stated the date as September 28, 2005.  August 28 is more likely.  The time is
given as 0118 hours, Fulton did not know whether Thompson had gunshot residue on
her hands, and he asked Roedel whether the first two bullets were "gonna be in the
floor or . . . gonna be in the wall."  Pet'r Ex. N at 14.  However, no part of the
recommended ruling would change depending on the date of this statement.

Id. at 365:5-17.

When Carlson secured the scene, he noted a .357 revolver on Roedel's bed. There were three live rounds and three spent cartridges in the cylinder. The hammer was cocked on a live round. Id. at 184:9-185:3, 270:24-271:6. Roedel said he kept the gun and a box of cartridges in a desk in his bedroom. Trial Tr. at 277:19-278:24. The cartridges in the box were the same as those in the cylinder. The two recovered bullets were fired from the .357. Id. at 475:9-477:19. It was mechanically impossible for the gun to fire unless someone pulled the trigger. Id. at 488:16-490:24. The trigger pull was almost sixteen pounds. With the hammer cocked, the pull was a little over five and a half pounds. Id. at 509:13-510:9.[3]

Carlson also noted the smell of freshly burned gunpowder in the stairwell. It was strongest at the top of the stairs. Id. at 184:17-18. When Thompson's body arrived at the state crime lab, fifteen particles of unburned gunpowder were located on the skin of her right abdomen, three on her right palm, and twelve on the right side of her face. Id. at 438:4-440:13. These particles were loose, not embedded in the skin. Id. at 401:17-402:8. "[T]here was loose gunpowder inside the body bag, inside the sheet around the body, and on the clothing" when Thompson's body was received

---

[3]   "[T]ake a five-pound bag of sugar and slide it across a table with your finger." Tr. at 519:5-6. Or a sixteen-pound bag of sugar.

at the state crime lab.  Id. at 395:18-20.  When a gun identical to Roedel's .357 and with similar ammunition was fired at a shooting range, it released a considerable amount of unburned gunpowder.

Both Thompson's and Roedel's hands were tested for gunshot residue. Thompson had twelve particles characteristic or indicative of gunshot residue on her right hand, seven on her left.  The makeup on Thompson's face precluded GSR analysis.  Trial Tr. at 647:15-649:5.  Roedel had six particles on his right hand, two on his left, and one on his face.  Id. at 649:18-650:16.  A defense expert testified that gunshot residue can be left behind after a weapon is fired, but it can also be transferred by touching a gun or cartridge or by touching a surface that has gunshot residue on it.  A shooter who touches his victim may also transmit gunshot residue. Id. at 653:10-655:6.

Karen and Ray Kleiv, two neighbors who were awake at the time of the shooting, said they heard three shots in succession, "probably a second apart."  Id. at 234:21-235:19, 238:3-19.  Other neighbors, who had been sleeping, testified they heard two shots more widely spaced, "at least ten to thirty seconds between them." Id. at 631:19-633:23, 637:21-638:1.  E., who was sleeping in a first-floor bedroom, testified that she heard "a noise."  At the time, she did not identify it as a gunshot.  An indeterminate time after that, her father knocked on her door.  Id. at 209:2-20, 225:17-

7

226:14.

The State offered to allow Roedel to plead guilty to mitigated deliberate homicide, with a maximum penalty of 40 years in prison and no parole restrictions. Roedel rejected the offer.  Id. at 23:16-25:9.  He did not testify at trial.  Id. at 663:19-665:8.

In closing argument, the State conceded that if Thompson had a gun at some point during the evening, she might have pointed it at Roedel, as he said in his 911 call.  Trial Tr. at 738:10-13.  But it also argued that Thompson must have been carrying the wine glass when Roedel began shooting at her, because her prints were clear, the shard was sandwiched between Thompson's blood and her body, and the small amount of wine in the glass would have evaporated in the dry Montana air if it had been there for any length of time.  A person would not engage in a struggle for a gun while holding a wine glass; therefore, the State argued, there was no earnest struggle for the gun.  Id. at 746:5-751:6.  After less than two hours' deliberation, the jury convicted Roedel of deliberate homicide.  Id. at 754:10-755:21.

Roedel is currently serving a prison sentence of ninety years.  Sentencing Tr. (doc. 13-5) at 89:15-22.  He timely filed his petition in this Court on June 22, 2010. 28 U.S.C. § 2254(d)(1)(A); Bowen v. Roe, 188 F.3d 1157, 1159 (9th Cir. 1999).

## II. Roedel's Allegations and Analysis

For present purposes, it is assumed that all of Roedel's claims were properly exhausted in the Montana Supreme Court.  It is more efficient to address his claims on the merits.  28 U.S.C. § 2254(b)(2); <u>Lambrix v. Singletary</u>, 520 U.S. 518, 524-25 (1997); <u>Gutierrez v. Griggs</u>, 695 F.2d 1195, 1198 (9th Cir. 1983).  At the same time, the deferential standards of 28 U.S.C. § 2254(d) will not be applied.  All claims are considered de novo.

Many, but not all, of Roedel's claims include allegations of ineffective assistance of counsel.  Where such claims arise, they are governed by <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  Roedel must show both that counsel's performance fell below an objective standard of reasonableness, <u>id.</u> at 687-88, and that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," <u>id.</u> at 694.  "[T]here is no reason . . . to address both components of the inquiry if the [petitioner] makes an insufficient showing on one."  <u>Id.</u> at 697.

### A. Arrest

Roedel argues that his arrest was unlawful because it was effected before the investigation, that "99% of what lame fabricated evidence the State did come up with . . . was all discovered or created subsequent to the arrest," Br. (doc. 1-1) at 12, and

that counsel failed to challenge the arrest.  Pet. (doc. 1) at 4 ¶¶ 15A, 15B.

When Carlson entered the garage with Roedel for the first time, Roedel told Carlson "they were arguing, and as she went down the stairs he shot her in the back." Trial Tr. at 186:9-10.  Carlson checked Thompson for a pulse and found none.  Id. at 181:22-182:4.  Those two facts added up to probable cause to believe that Roedel knowingly caused Thompson's death.   There were also exigent circumstances, because Roedel could have destroyed or created evidence if he had remained in the home.  Assuming he was not free to leave when he was placed in the patrol car, the arrest was lawful.  It did not become unlawful at any later point.  This claim should be denied.

**B. Media Influence on Roedel's Statement**

Roedel complains that he was "so overborne with a media news cast that . . . I questioned my own recollection of events."  Br. at 11; Pet. at 4 ¶ 15B.  The media report stated that Roedel's neighbors heard three shots in quick succession, so Roedel told police that was true, though he declared later, as well as earlier, that it was not.

If Roedel had given only two versions of events, it might be possible to find some sort of claim here.  But Roedel has not told the same story twice in five years. He said he and Thompson were arguing, and he shot her in the back.  Trial Tr. at 186:8-10.  He said they were fighting over the gun when it went off, and he shot her

10

in the back.  Id. at 252:23-25.  He said there was something wrong with the gun and

he spun the cylinder, popped it back in, it fired, and he shot her in the back.  Pet'r Ex.

N at 21.  He said he did not shoot her in the back.  Sentencing Tr. (doc. 13-5) at 70:1.

He said Thompson fired at him twice and that is why she had gunshot residue on her

hands.  Pet'r Ex. N at 12.  He said Thompson only pretended to fire at him twice but

actually just slammed the door.  Pet'r Ex. F at 31.[4]  He said she put the gun to his

head and then fired twice.  Pet'r Ex. N at 21.  He said she fired twice and then put the

gun to his head.  Sentencing Tr. at 49:7-14, 50:13-23.  He said she aimed at him, id.,

and did not aim at him, Pet'r Ex. N at 12.  He said Thompson was outside the garage

and was killed by the second bullet, which was never found because it is still inside

her body.  Pet'r Ex. B at 13-14.[5]  He said she startled him by making a noise at the

bottom of the stairs and he tripped and fell, discharging the gun.  Pet'r Ex. C at 3.

Roedel's claim that media reports about the manner in which the shots were

fired caused him to question his recollection should be denied.

**C. Voir Dire**

A prospective juror must not serve on a jury if his or her views would "prevent

---

[4] Exhibit F is a transcript of a police interview on September 19, 2005.  Trial
Tr. at 363:5-18.

[5] Roedel filed Exhibits B and C in the state postconviction proceeding.

or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424 (1985). The purpose of voir dire is to identify jurors who are not able to be impartial and screen them out. E.g., Fields v. Brown, 431 F.3d 1186, 1192 (9th Cir. 2005).

Flathead County Deputy Sheriff Rod Meyers was a member of the panel of prospective jurors. Meyers was not selected to serve as a trial juror, but Roedel asserts that he "slipped through jury screening" and that his presence on the panel tainted it. Br. at 24. Along with the rest of the venire, Meyers was questioned during voir dire. He was not "over-anxious." Br. at 10. He raised his hand when the prosecutor asked whether any jurors were connected with law enforcement. He was "asked to put his hand down," id., because his employment had already been established. Another juror was told, at the same time and for the same reason, to put her hand down. Trial Tr. at 50:2-22, 52:1-6.

Defense counsel elicited Meyers' comment that he had "a feeling," "based on the officers involved," that Roedel was guilty. But Meyers also said he could be fair to Roedel, listen only to the evidence, ignore the shoptalk because it might not be true, and hold his head up when he returned to work if he voted not guilty. He concluded, "I honestly don't have a feeling either way. I know the officers involved, and other than that I don't have a hard and fast decision or bias." Trial Tr. at 115:11-

12

119:19, 44:13-45:9.  Again, Meyers did not serve.  Id. at 153:12-16.  There was no basis to dismiss the entire panel.  To whatever extent defense counsel's elicitation of Meyers's comment might have been unwise, Roedel can show no prejudice.  A reasonable juror would not conclude that Roedel must be guilty because Meyers knew the officers.  There is no reasonable probability that Roedel would have been acquitted if Meyers had not been on the panel.  Strickland, 466 U.S. at 694.

Roedel claims the jury was biased because "half the jurors were from Bigfork," where Thompson worked as a mail carrier, and the other half "were law enforcement."  Br. at 10.  Only one juror said, "She was my mail lady, but I never met her."  Trial Tr. at 51:17-18.  The juror gave no indication she could not be impartial, and she did not serve on the jury.  Id. at 153:12-16.  Several jurors had connections to law enforcement, though only Meyers was an officer, but all said they could be impartial.  E.g., id. at 132:10-149:14.

Roedel also claims that the media biased the jury.  In the voluminous materials that were not scanned into the electronic record, Roedel asserts that trial witness Ray Kleiv said on television that "'he wished it were Roedel who was dead'" rather than Thompson.  Pet'r Ex. B at 7.  One prospective juror, James Nadeau, Br. at 12, told the trial judge, in chambers without the other jurors present, that he had formed the opinion, from reading the newspapers, that Roedel was probably guilty because he

13

was claiming the shooting was accidental, yet three shots were fired.  Nadeau was excused.  Trial Tr. at 58:5-63:24.

There is no evidence that any juror who deliberated was biased by either Kleiv's statement or any other aspect of the media coverage.  Both the jury pool and the process of voir dire were unremarkable.  All claims suggesting jury bias should be denied.

### D. Ineffective Assistance of Counsel

#### (1) Trial Counsel

Roedel claims that his retained counsel, Jack Quatman, was ineffective in voir dire for "using a police comment," putting an ad in the local newspaper about a hearing in California questioning his honesty, and admitting he (counsel) was a "liar." E.g., Br. at 5-6, 17.

In the incident to which Roedel refers, counsel asked Mr. Miller, a potential juror who had served for 20 years as a police officer in California, whether he still watched California news.  Miller said, "Once in a while when it's on TV."  Then the following exchange occurred:

> Mr. Quatman:     Okay.  I was a prosecutor in Alameda, California, –
> Oakland – for 25 years.
> . . .
>      And that – I mean like you it's a prior life, I'm
> a lawyer up here now.

14

|                  | Last year I was subpoenaed to testify concerning the procedures of my old office in death penalty litigation.  And I did that, and the roof caved in.  It had to do with how they pick juries in death penalty litigation.  Did you happen to read any of that stuff? |
|------------------|---|
| Mr. Miller:      | No, I didn't. |
| Mr. Quatman:     | Okay.  Did anybody here happen to read any of that stuff? |
| Ms. Eddington:   | It was in the Inter Lake. |
| Mr. Quatman:     | You're a heck of a reader.[6]  And they called me a liar in there, did you read that? |
| Ms. Bennett:     | I don't remember what they said, but I remember your name, it was Quatman. |
| Mr. Quatman:     | Yeah, I get subpoenaed down there and I have to tell them what we were training people to do, and they called me a liar, and I'm going, well, that's a great deal. |
| Ms. Bennett:     | So tell me your side.  No. |
| Mr. Quatman:     | See, the problem was that I had been appointed to train in my old office, so that's how I got nailed, and they came down, they go, do you guys really do this?   Well, I'm not telling you unless I get subpoenaed.  And I promised to tell the truth, and yeah, we really did it.  And everybody got all upset. |

---

[6]  This juror previously said she had read about Roedel's case in the <u>Bigfork Eagle</u>.  Trial Tr. at 51:5-12.  The "Inter Lake" is the <u>Daily Inter Lake</u>, published in Kalispell.

15

> California Supreme Court's sniffing around it now.
> Any problem with that?  Anybody read any of those
> articles?  Man, I wish I hadn't said anything, but
> there you go.

Trial Tr. at 130:19-132:9.

It is not clear whether counsel's wish that he "hadn't said anything" referred

to his comments to the potential jurors or his declaration and testimony in the

California hearing.  Regardless, while this exchange is unusual, it was not

unreasonable, and it did not prejudice Roedel.  Counsel knew that some jurors may

have heard his name in connection with questionable behavior, and some had.

Though no one recalled particular information, they might have remembered

something negative in the course of the trial.  It was well within the "wide range of

reasonable professional assistance" for counsel to bring it up in order to explain his

point of view.  Strickland, 466 U.S. at 687-88.  Further, the jury was instructed that

its verdict had to be based on the evidence and the law, e.g., Trial Tr. at 163:5-164:3,

682:2-5.  The jury's opinion of Roedel's lawyer, good or bad, was neither evidence

nor law. Finally, the evidence was overwhelming.  There is no reasonable probability

that the jury might have acquitted him if only Quatman had not mentioned his

California quandary.  Strickland, 466 U.S. at 694.  This claim should be denied.

### (2) Appellate Counsel

Roedel asserts that appellate counsel was ineffective because, in challenging trial counsel's performance during voir dire on appeal, she failed to tell the Montana Supreme Court about "what appears to be six deliberate 'set-up' lines . . . regarding telling the truth." Br. at 6 (citing Trial Tr. at 28, 67, 69, 71, 82, 121). He also complains that she failed to submit "any verification such a 'liar hearing' ever took place." Id.[7] Appellate counsel cannot introduce new evidence into the record on appeal. Mont. R. App. P. 8(1). Roedel's transcript citations refer to unexceptional statements about the jury's role in deciding which witnesses it believes and which it does not. This claim should be denied.

### E. Bias of Judges and Attorneys

Roedel claims that the court and the attorneys were all biased against him because they all likely received investment solicitations by mail from private prison companies and therefore had a material stake in his conviction and imprisonment. He

---

[7] For what it is worth, the hearing occurred. See Dean E. Murphy, "Case Stirs Fight," New York Times (Mar. 16, 2005); Jim Herron Zamora, "Attorney's missteps have freed convicts," San Francisco Chronicle (Mar. 20, 2005) (noting pending hearing). Presumably these articles, or others like them, also appeared in the Kalispell and Bigfork newspapers. See also In re Freeman, 133 P.3d 1013, 1015 (Cal. 2006) (adopting referee's finding that Quatman's reported conversation with trial judge was "not credible and . . . did not occur.") The cited articles appeared a little over a year before Roedel's trial. The California Supreme Court issued Freeman on May 16, 2006, about six weeks after trial.

also says that a judge not involved in his case had an affair with Roedel's ex-wife, and that that judge had an affair with the trial judge.  Br. at 11, 16.  These claims are frivolous.  E.g. Br. at 16 (referring to "rumor among police officers at the Flathead County Detention Center").

Roedel also refers to the ACLU's 2002 lawsuit against the state and seven counties in Montana, including Flathead County, regarding the quality of criminal defense services provided to indigents.  White v. Martz, No. CDV 2002-133 (Mont. 1st Jud. Dist. filed Feb. 14, 2002).  Roedel retained Quatman.  Br. at 7; see also Mot. to Supp. Attachment (doc. 7-2) at 1.  This claim should be denied.

Finally, Roedel speculates his trial counsel might have been affiliated with the Jehovah's Witnesses, who "sabotage[d] my rentals every time I took an ad out."  Br. at 18.  This claim is frivolous.

### F. Sufficiency of the Evidence

Roedel contends the evidence was "totally unsupported by any underlying substantive data that would tend to prove the elements of deliberate homicide."  Pet. at 4 ¶ 15B; Br. at 14.  He "is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 324 (1979).  Whether or not there was a struggle over the gun before or during the firing

18

of the first two shots, any reasonable juror could have found, beyond a reasonable doubt, that Roedel knowingly caused Thompson's death by shooting at her when she posed no threat to him because she was fleeing. Supra at 2-8; see also In re Winship, 397 U.S. 358, 364 (1970); Mont. Code Ann. §§ 45-5-102(1)(a), 2-101(35) (2005). This claim should be denied.

### G. Witness Kleiv

Roedel alleges that Kleiv perjured himself. Br. 12, 23. Nowhere in the documents in the electronic record or in the voluminous materials that were not scanned does Roedel identify a false utterance by Kleiv. Roedel claims Kleiv could not have heard the shots in the pattern both he and his wife described but proffers no evidence proving that fact, much less that Kleiv deliberately misrepresented it. This claim should be denied.

### H. Suppression or "Negation" of Exculpatory Evidence

Roedel claims the State suppressed and "negated" exculpatory evidence. Pet. at 4 ¶ 15B. "[S]uppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963); see also Kyles v. Whitley, 514 U.S. 419, 433-34 (1995). The prosecution has no duty to create exculpatory evidence. E.g., United

States v. Bracy, 67 F.3d 1421, 1429 n.5 (9th Cir. 1995); United States v. Monroe, 943 F.2d 1007, 1011 n.2 (9th Cir. 1992).

The Constitution is not violated when a prosecutor introduces inculpatory evidence at trial and does not introduce exculpatory evidence in order to convince the jury that the defendant is guilty.  A trial is an adversarial proceeding.  U.S. Const. Amend. VI; Black's Law Dict. 1510 (7th ed. 1999).

### 1. Thompson Fired a Weapon

Roedel complains the "evidence confirmed more likely than not the other party [Thompson] did fire a weapon, no evidence to the contrary," Pet. at 4 ¶ 15A. Assuming this is true, though it is not, Trial Tr. at 652:20-655:6, the evidence was not only disclosed to the defense but discussed before the jury at trial, id.  It was not suppressed.  This claim should be denied.

### 2. No GSR Test of Roedel's Torso or Head

Roedel claims that a gunshot residue test should have been done on his torso and head because "I told police she fired twice at me and finally put the gun to my head," Br. at 21.[8]  He does not claim a test was done but the results were lost or

---

[8]  In the materials before this Court, the only time Roedel said Thompson fired twice and then put the gun to his head was at sentencing.  Sentencing Tr. at 49:7-14, 50:13-23.  Before trial, Roedel said Thompson woke him by holding the gun to his head in his bedroom, then later, in the stairwell, fired at him twice.  Pet'r Ex. N at 14 ("I did not have the feeling that it was shot down next to me, and I think that it was

suppressed; he complains that one should have been done.  <u>Brady</u> does not apply because the prosecution is not required to create evidence.

Nor is there reason to believe anything other than standard procedure was followed.  Roedel mistakes the purpose and understates the limits of a GSR test.  The test "places somebody in an environment or outside of an environment."  Trial Tr. at 335:2-3.  Its results will be more or less useful depending on the circumstances of the case.  If, for instance, Thompson had been outside when all three bullets were fired, one would expect to find little GSR even if she entered the bottom of the stairwell before she died.  But if Thompson and Roedel were near each other in the closed stairwell when either of them fired a shot – as Roedel has almost always maintained – GSR would likely be found on both.  Further, Roedel's own expert testified that a person will remove residue by "doing things with his hands and his face, as we all do, we run our hands through our hair, we put our hands in our pockets," and so forth, Trial Tr. at 653:22-654:2, and residue can be transferred to others, <u>id.</u> at 654:8-655:6.  Just as finding residue in Roedel's pocket would not mean Thompson thrust the gun into his pocket, testing his head or torso would not mean Thompson held a gun to him.

_____

to scare me more than any . . . thing."); <u>id.</u> at 21 (interviewer says, "She's already screwed the muzzle in your head when she woke you up," and Roedel responds, "Uh-huh.").

Further, the jury knew that Thompson had more gunshot residue on her hands than Roedel did, yet it still inferred that he shot her.  There is no reason to believe the jury would have acquitted Roedel if he had GSR on his head and torso.

There was neither suppression nor loss of material, exculpatory evidence.  This claim should be denied.

### 3. "Dawn Was Out of the Building"

Roedel claims "I told officer I was sure Dawn was out of the building at the time the gun discharged" and that there was no evidence she was inside.  Br. at 16. He might have said that at some point,[9] but the evidence that she was in the stairwell when she was shot included the path the bullet took through her body, the abrasions on her legs, the position of her body, the loose gunpowder on her body, the state of the bullet found in the ragged bullet hole, and all the rest of Roedel's own statements. This claim should be denied.

---

[9]  For instance, at one point Roedel claimed the second bullet, which went through the wall but was not found, actually killed Thompson, who was outside at the time; he infers that x-rays would have shown the bullet was still in Thompson's body. Pet'r Ex. B at 13-14 (Sept. 17, 2009).  This theory does not account for the exit wound in Thompson's left flank.  Trial Tr. at 378:11-12.  It does not explain how Thompson could walk back into the garage and up a few steps, turn around, and collapse down the stairs after the bullet grazed two of her vertebrae.  Id. at 414:15-20. It does not explain why she would walk into the garage to tell him he shot her, Trial Tr. at 365:5-17, when she had minutes before, threatened to kill him – especially when she knew she had no gun and knew he did.  The theory does not fit the evidence.

### 4. Detective Landis

#### (A) Trace Evidence

Roedel claims that Detective Landis "deliberately lost" trace evidence from Dawn's forehead by smearing it with GSR swabs rather than dabbing or dotting it. Br. at 25-26.  It was not Landis who took the swabs from Thompson.  Trial Tr. at 333:16-334:17.  The jury heard about the difference between dabbing and smearing swabs on the skin to collect gunshot residue.  E.g., id. at 393:7-394:23.  No gunshot residue could be found on Thompson's face due to the quantity of bismuth, an "inorganic material commonly used in makeups and lotions."  Id. at 649:1-2. Gunshot residue was found on both of Thompson's hands, more than on Roedel's, and the jury knew this.  Id. at 647:15-649:5, 649:18-650:16.  There is no reason to believe Landis or any other officer deliberately destroyed crucial evidence.  This claim should be denied.

#### (B) Disconnected Phone

Roedel claims Landis perjured herself by claiming to have "magically caused the phone to operate by manipulating the earpiece," while he claims that police photos show the phone was "unplugged or disconnected," Br. at 26.  Landis said, "The particular phone that I checked that was disconnected in [Roedel's] bedroom, once I plugged in the earpiece and the bottom piece without touching anything

downstairs[,] was functioning properly." Trial Tr. at 345:18-21. This claim should be denied.

### H. Stairwell Updraft

Roedel avers that the distribution of loose gunpowder on Dawn's abdomen can be explained by the "chimney like updraft" in the stairwell. He asked counsel to test the wind speed and direction in the stairwell, Br. at 21 ¶ 10, but counsel failed to investigate, Pet. at 4 ¶ 15A. He states, "I believe Dawn's gunpowder blew back over her . . . proving Dawn fired the gun into the wind from the top landing in an attempt on my life." Br. at 9.

If one assumes that Thompson stood at the top landing and fired the gun down the stairs, a chimney effect might explain why she had loose gunpowder particles on the right side of her abdomen, face, and hand. But if one assumes that Roedel fired the first shot while Thompson was facing up the stairs, one does not even need a chimney effect to explain how she came to have loose particles of gunpowder on her. At the same time, if the State had tested Roedel's head and torso for gunshot residue, the results might have proven the chimney effect. Whether it existed or not, the chimney effect would not undermine any particular evidence to the extent of making an acquittal a realistic possibility. This claim should be denied.

### I. Polygraph Test

Roedel claims he was denied a polygraph test.  Br. at 17.  He fails to show that a polygraph test would have shown that any of his exculpatory statements were true.  None of his statements fit all the evidence as well as his first, when he told Carlson "they were arguing, and as she went down the stairs he shot her in the back."  Trial Tr. at 186:8-10.  Additionally, in Montana, polygraph results are inadmissible even if exculpatory.  State v. Beachman, 616 P.2d 337, 403-04 (Mont. 1980); see also United States v. Scheffer, 523 U.S. 303, 308-09 (1998) (holding per se exclusion of polygraph tests constitutional).  This claim should be denied.

### J. Closing Arguments

Roedel claims the prosecution engaged in "unethical speculation and conjecture," made "other wrongful closing remarks," Br. at 5, and complains that neither defense counsel nor the court intervened.  There is no constitutional basis for objecting to a prosecutor's argument that a defendant is "guilty," and that is the only remark that Roedel identifies as wrongful, Br. at 24.  This claim should be denied.

### K. Dawn's Motive for Shooting

Roedel asserts that counsel failed to investigate and the prosecution suppressed Thompson's motive for shooting at him.  Pet. at 4 ¶ 15B.  He refers to Thompson's "sudden serious credit card max-out," and the "family's life insurance policies," Br.

25

at 22. He also avers that "Dawn Thompson planned the shooting months in advance," referring to their son N.'s letter and a deposition. Final Am. (doc. 11) at 3; see also Br. at 18.[10]

Roedel does not adduce these facts to support a theory of self-defense. He has never claimed that he deliberately killed Thompson because it was her or him. He cannot, because she was shot in the back when she was more than five feet away from him. Nor does he claim he knew her "motives" on August 27, 2005; hence, he claims a Brady violation, that is, that the prosecution should have disclosed this evidence to the defense. The only conceivable role for these facts is to support his factual allegation that Thompson fired at him (or pretended to fire at him) in an attempt to kill him. If the jury believed that Thompson was the aggressor, it might have been more likely to believe that Roedel was surprised and panicky, and that, in turn, would support his theory of an accidental shooting.

There are several defects in the claim, but the decisive one is that Roedel cannot show the evidence was material or that he was prejudiced by counsel's failure

---

[10] Roedel also says, "Dawn Thompson possessed a GSR count well beyond accidental contamination on the outer thumb-forefingers skin web, that never touched the gun from mere handling," Final Am. at 3. There is no evidence to support either this claim or its corollary that her own firing of a gun or accidental means were the only two ways residue could be left on Thompson's hands. For instance, Roedel could have transferred GSR to Thompson by touching her after the shooting. Trial Tr. at 653:18-655:6.

to investigate or introduce it.  He does not show Thompson's credit card debt, the alleged life insurance policies, or N.'s deposition, but he includes N.'s letter.  The letter says Thompson was interested in what Roedel was doing with his real property. That is not surprising, because they were married and had children together.  The letter also relates an incident, possibly in June 2005, when Thompson told the children they were leaving their father's house.  She carried a loaded .22 in the small of her back and told "us to 'cold cock dad in the back of the head' if he attempted to make his way down stairs[,] at the time making it seem like it was her life we were protecting."  She "sounded almost angry" when she asked N. if a .22 bullet could kill someone, and, when he said he did not know, "almost looked like she was in thought."  Letter (doc. 7-1) at 1-3.

Setting aside its inadmissibility, the letter is a long, long way from "attesting and verifying" that Thompson "planned the shooting months in advance," as Roedel claims.  It just as reliably suggests that Roedel killed Thompson to prevent her from leaving him.  Likewise, many people have substantial life insurance policies on their spouses, and many of the same people have substantial credit card debt, without plotting murder.

The evidence Roedel describes does not undermine confidence in the jury's verdict.  It is neither material under Brady, Strickler v. Greene, 527 U.S. 263, 300-01

(1999), nor prejudicial under <u>Strickland</u>, 466 U.S. at 694.  This claim should be denied.

**L. Counsel's Defects**

Roedel asserts some claims of ineffective assistance independently of any other claims.  First, he complains that counsel contradicted himself.  He cites page 174 of the trial transcript, where counsel says Dawn fired two shots and Roedel fired the third, and pages 727-728, where counsel says Roedel fired all three shots.  Br. at 6.  Both Roedel's claim to have fired one shot and his admission that he might have fired all three were introduced into evidence.  No matter what defense counsel did, the jury was bound to realize that Roedel gave more than one explanation.  Further, the defense theory was that the State had no reliable way of knowing what happened, <u>e.g.</u>, Trial Tr. at 175:5-176:22, so the jury had to find reasonable doubt and acquit.  Multiple possibilities, even if they could not all be true, supported that theory.  Neither prong of <u>Strickland</u> is met.  This claim should be denied.

Roedel claims "[e]very indication of confederation or conspiracy is manifest throughout the proceedings," Br. at 18, that counsel failed to present meritorious objections, "contradicted the events," let perjured testimony stand, offered no evidence of Thompson's motive for shooting him, and offered no defense strategy.  Pet. at 4 ¶ 15A.  The defense strategy and the relevance of Thompson's motive have

28

been discussed.  The trial transcript alone refutes the other claims.  It suggests no conspiracy, no basis for objections or perjury claims, and no misstatements of the evidence by counsel (if that is what "contradicting the events" means).

Roedel claims that counsel "knew of the Landis/Roedel interview . . . and had to be aware of the computer content," that is, on Thompson's computer, yet counsel "denied the same" in an affidavit submitted in state postconviction proceedings.  Br. at 12.  Counsel did not deny knowing about the computer.  He denied that Roedel mentioned or asked him to investigate it.  Quatman Aff. (doc. 13-8) at 3 ¶ 23. Regardless, a law enforcement agent searched the computer and "discovered a lesbian web site and other pornography which appears to have been visited by Dawn."  Pet'r Ex. D at 1.[11]  Like N.'s letter, this evidence is equally reliable in suggesting that Roedel had a motive for attacking Thompson as in suggesting Thompson had a motive for attacking him.  Roedel was not prejudiced by counsel's failure to introduce it.  This claim should be denied.

Finally, Roedel also complains that counsel failed to "groom" him for the stand.  Pet. at 4 ¶ 15A.  In light of Roedel's interviews with investigating officers and his testimony at sentencing, e.g., Sentencing Tr. at 50:13-52:15, 58:9-61:20, 66:4-70:6, 72:7-73:11, it is clear he was not prejudiced by not testifying.  This claim

---

[11]  Pet'r Ex. D is a motion in limine filed before trial.

should be denied.

### M. Self-Diagnosed Post-Traumatic Stress Disorder

Roedel says, "From reading early interviews with police and myself it appears I was suffering some degree of post traumatic stress from being shot at."  Br. at 17; see also Mot. to Supp. (doc. 6) at 1-2.  This is not evidence that Roedel has PTSD, much less that Thompson shot at him.  Further, there is no reason to believe that the officers who took any of his statements knew of and exploited his alleged PTSD. This claim should be denied.

### N. Real Property Claims

Roedel claims an associate in Quatman's office did not effectively represent him in a civil action filed against an attorney-in-fact who allegedly accepted kickbacks from an auctioneer who sold property belonging to Roedel so he could pay Quatman.  Roedel says "I do not know who owns those properties or how or if anyone is connected to Quatman."  Br. at 7; see also Mot. to Supp. Attachment (doc. 7-2) at 1.  These allegations are speculative and do not undermine Roedel's conviction.  E.g., Strickland, 466 U.S. at 687-88, 694; Mickens v. Taylor, 535 U.S. 162, 175 (2002).

### O. Fabricated Evidence

Roedel claims evidence was fabricated, but he does not identify what evidence it was.  E.g., Pet. at 4 ¶ 15B.  He also lists numerous items that the State or his

counsel failed to investigate and provides a list of 41 questions that were not answered by the State's investigation. Br. at 20-24. To the extent these matters have not already been addressed, Roedel has failed to carry his burden of explaining why the defects he mentions pose a realistic possibility of an acquittal. As grounds for relief, all these claims should be denied.

### P. Errors in State Proceedings

Finally, Roedel alleges that his appeal and the postconviction proceedings in his case were marred by denial of an evidentiary hearing, by "equal rights abuse," and by denial of counsel and negation and suppression of exculpatory evidence or information,[12] Pet. at 4 ¶ 15B; see also Br. at 2. However, he was treated no differently in the postconviction appellate proceedings than anyone else. He was entitled to counsel on direct appeal, and he was in fact represented. He was not entitled to postconviction counsel. E.g., Pennsylvania v. Finley, 481 U.S. 551, 555 (1985); Mont. Code Ann. § 46-21-201(2) (requiring appointment of counsel only under certain conditions not met here). Again, he fails to allege any realistic possibility that he might have prevailed in the state court proceedings if only the alleged errors had not occurred. These claims should be denied.

---

[12] The word is illegible.

### III. Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Rule 11(a), Rules Governing § 2254 Proceedings.  A COA "may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c); Hohn v. United States, 524 U.S. 236 (1998).

The volume of Roedel's theories, the utter conviction with which he insists on each of them in turn, the tests he claims should have been done, the questions he claims should have been asked, all superficially suggest this case is complex.  It is not.  Importantly, though Roedel's case was often described as a matter of self-defense, Roedel himself has never said he deliberately killed Thompson because it was either her or him.  After all, she was shot in the back from more than five feet away.  Instead, he insisted the shooting was an accident, suggesting several mutually exclusive scenarios.  The evidence plainly showed that Roedel deliberately shot Thompson in the back.

Roedel has not shown a single defect in the prosecution's conduct, in counsel's performance, or in the overall fairness of his trial.  There is no substance in any of the numerous constitutional violations he alleges.  The state and federal law underlying denial of his claims is well-established.  No reasonable jurist could find viable claims

or a reason to encourage further proceedings.  A certificate of appealability should be denied.

Based on the foregoing, the Court enters the following:

## RECOMMENDATION

1.  The Petition (docs. 1, 6, 7, 11) should be DENIED on the merits.

2.  The Clerk of Court should be directed to enter by separate document a judgment in favor of Respondents and against Petitioner.

3.  A certificate of appealability should be DENIED.

## NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Pursuant to 28 U.S.C. § 636(b)(1), Petitioner may serve and file written objections to this Findings and Recommendations within fourteen (14) days of the date entered as indicated on the Notice of Electronic Filing.  A district judge will make a de novo determination of those portions of the Findings and Recommendations to which objection is made.  The district judge may accept, reject, or modify, in whole or in part, the Findings and Recommendations.  Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

33

<u>Roedel must immediately notify the Court of any change in his mailing address by filing a "Notice of Change of Address."</u>  Failure to do so may result in dismissal of this action without notice to him.

DATED this 15th day of September, 2010.


 <i>/s/ Jeremiah C. Lynch</i>
Jeremiah C. Lynch
United States District Court